## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                         Crim. No. 16-258 (DSD/BRT)

       Plaintiff,

v.                                                                **REPORT AND**
                                         **RECOMMENDATION**

Houston Oliver,

       Defendant.

LeeAnn K. Bell, Esq., United States Attorney's Office, counsel for Plaintiff.

Gary R. Wolf, Esq., Wolf Law Office, counsel for Defendant Oliver.

BECKY R. THORSON, United States Magistrate Judge.

     Defendant Houston Oliver was indicted on a single count of conspiracy to distribute cocaine. (Doc. No. 1, Indictment.) He was previously indicted for the same offense in *United States v. Oliver, et al.*, Case No. 15-cr-164 (DSD/BRT). On March 14, 2016, the Government moved to dismiss the previous indictment against Defendant prior to trial. (Case No. 15-cr-164, Doc. No. 188.) That motion was granted by United States District Judge David S. Doty. (Case No. 15-cr-164, Doc. No. 189.) The Government re-indicted the Defendant on September 27, 2016.

     Defendant moved to suppress in the previous case, an evidentiary hearing was held, and this Court issued a Report and Recommendation that Defendant's motion to suppress and for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), be denied.

(Case No. 15-cr-164, Doc. No. 117, October 13, 2015 Report and Recommendation ("R&R").) Judge Doty adopted this Court's Report and Recommendation on November 23, 2015. (Case No. 15-cr-164, Doc. No. 146, November 23, 2015 Order Adopting R&R.)

Defendant now moves to suppress on grounds that are largely duplicative of those that were raised in the previous case. (Doc. No. 18.) Defendant also moves to dismiss the Indictment. (Doc. No. 17.) An evidentiary hearing was held on Defendant's motions on November 15, 2016. (Doc. No. 29.) At the hearing, Minneapolis Police Sergeant John Biederman testified about the investigation that led to the seizure of Defendant's gray BMW in Minnesota. (Doc. No. 33, 11/15/16 Mot. Hr'g Tr. [hereinafter "Tr."] at 13–35.) Also at the hearing, the Government prospectively offered as exhibits the search warrants for Defendant's BMW, cell phones, residence, hotel room, and other properties. (Doc. No. 30, Exhibit List.)[1] Based on the evidence presented at the hearing, and for the reasons detailed below, this Court recommends that Defendant's motions to suppress and to dismiss be denied.

## I.    Factual History

Sergeant John Biederman is a twenty-year veteran of the police force who has worked many types of cases, including narcotics cases. (Tr. at 13.) Sergeant Biederman has also worked with many reliable confidential informants ("CI" or "CRI"). (Tr. at 14.)

---

[1]    These six exhibits were delivered to the undersigned's chambers the day after the hearing on November 16, 2016. (*See* Doc. No. 38, Exhibit List, Ex. 1-6.) The exhibits are identical to the corresponding exhibits that were introduced in Case No. 15-cr-164.

A CRI is a person who has a track record of providing reliable and accurate information to law enforcement that assists in prosecution, gathering of evidence, and making arrests. (*Id.*)

On November 25, 2014, Sergeant Biederman was contacted by a CRI. (*Id.*) The CRI told Sergeant Biederman that Defendant, along with Desmond Williams and James Green, would be mailing cocaine from Arizona to the Minneapolis-St.Paul area. (Tr. at 14–15.) According to the CRI, Williams and Green would be bringing the packages to a post office in Maricopa, Arizona. (Tr. at 15.) The cocaine would be placed in a package originally designed to hold flatware and mailed in a two-day priority package box. (Tr. at 15–16.) Historically, Defendant had mailed cocaine using two-day priority packages from the post office. (Tr. at 15.) Given the CRI's proven track record over the "last several years," which included supplying information that led to evidence, arrests, and felony convictions, Sergeant Biederman considered the information to be reliable and passed it along to Minneapolis Postal Inspector John Western. (*See* Gov't Ex. 2 at 2; Tr. at 16.)

Armed with this information, the Postal Inspector found two packages, both two-day priority mail, of similar weight and with similar handwriting, one from Maricopa's post office and the other from Chandler, Arizona. (Gov't Ex. 2 at 2; Tr. at 17.) A drug dog alerted to the presence of cocaine in the packages, and the Postal Inspector obtained a search warrant. (Tr. at 17.) The search revealed, as the CRI described, cocaine packaged in silverware boxes. (*Id.*) Each package contained approximately two kilograms of cocaine. (Gov't Ex. 2 at 2.)

Sergeant Biederman, along with Minneapolis Police Officer Danielle Evans, spoke with Desmond Williams on November 30, 2014. (Tr. at 18; Gov't Ex. 2 at 2.) Biederman and Evans have over a decade of police experience and were assigned to investigate weapons and narcotics offenses. (Gov't Ex. 2 at 2; Gov't Ex. 6 at 2.) Williams admitted to sending one of the packages of cocaine, and stated that Green had mailed the other. (Tr. at 18; Gov't Ex. 2 at 2.) Williams's description of the package was similar to the CRI's description. (Tr. at 18.) Williams also stated that he and Green were present when Defendant packaged the drugs at an Arizona home and that Defendant had supplied him with a cell phone to use for drug-related business. (Gov't Ex. 2 at 2; Gov't Ex. 6 at 2.)

Around the same time, Sergeant Biederman also learned from the CRI that Defendant would be transporting a large quantity of cocaine from Arizona to Minnesota in a gray BMW with Minnesota plates, scheduled to arrive in Minnesota on November 30, 2014. (Gov't Ex. 2 at 2; Tr. at 19.) A records check revealed that Defendant was the owner of a 2002 BMW 745li with Minnesota plates 672CAZ. (Tr. at 19; Gov't Ex. 1 at 2.) On November 30, 2014, Minneapolis Police officers set up on I-35 in an effort to locate the vehicle. (Gov't Ex. 2 at 2.) The vehicle was located on I-35 around Lakeville and stopped by Minnesota State Patrol on the Crosstown/I-35 commons. (*Id.*) Although the vehicle was registered to Defendant, a man named Sharrod Rowe was the driver and sole occupant of the car when it was pulled over. (Gov't Ex. 2 at 2–3; Gov't Ex. 6 at 2.) The vehicle was not searched at that time. (Gov't Ex. 1 at 1; Gov't Ex. 2 at 2–3.) Instead, it was towed to an impound lot. (Gov't Ex. 1.) The following day, on December 1, 2014, Williams notified Sergeant Biederman that Defendant was "hysterical" over the fact that

4

law enforcement had stopped his BMW and taken Rowe into police custody. (Gov't Ex. 2 at 2.)

On December 2, 2014, Sergeant Biederman secured a warrant to search Defendant's impounded BMW for narcotics, "[i]tems that show responsibility for narcotics" and "a connection between the narcotics or vehicle with an address or person," and "[d]ocuments, mailings, keys, address books, cell phones (and content), receipts, bills, rental agreements, photographs, notes and other media." (Gov't Ex. 1 at 4.) Officers promptly executed the search warrant and found six kilograms of cocaine hidden inside a speaker in the trunk of the BMW, a receipt in Green's name for new tires purchased on November 28, 2014, a cell phone, and documents addressed to Defendant at particular addresses on Dupont Avenue North and Washington Avenue in Minneapolis. (Gov't Ex. 1 at 5; Gov't Ex. 2 at 2–3.)

Sergeant Biederman and Officer Evans then re-interviewed Williams, who told them that Defendant recently contacted him by telephone and told him, in coded language, that six bricks of cocaine were in the BMW when it was stopped. (Gov't Ex. 2 at 2.) Williams also told the officers that Defendant lived in a home on Dupont Avenue North, owned a second-story loft on North Washington Avenue, owned another building on West Broadway Avenue, and was currently staying with his girlfriend in a Minneapolis hotel. (Gov't Ex. 5 at 3.) Sergeant Biederman confirmed that Defendant was connected to these properties and determined that Defendant's girlfriend had rented room 134 at the Marriot Hotel, 525 North Second Street. (*Id.*)

Later that day, Sergeant Biederman obtained four additional warrants to search Defendant's Dupont Avenue home, Washington Avenue loft, West Broadway Avenue building, and Marriott Hotel room for narcotics; cash and proceeds from the sale of narcotics; and documents, mailings, photographs, keys, address books, notes, receipts, ledgers, and "other media that shows standing at an address, responsibility for a vehicle, connections between persons, the location of the proceeds from the sale of narcotics, or that a crime has been committed." (*See* Gov't Exs. 2–5 at 1.) The warrants for the addresses on Dupont, Washington, and West Broadway Avenues also expressly authorized the seizure of cell phones; the warrant for the Marriot Hotel room did not. (*See id.*)

Sergeant Biederman's affidavits in support of all four search warrants were virtually identical and recounted the information provided by the CI; the CI's track record over the last several years; Williams's statements and "confirm[ation] of the [CI's] information concerning the packages being dropped off at the post office, the way they were packaged, and those involved"; and the other investigative efforts corroborating the CI's information, including the two packages of cocaine intercepted by postal inspectors, the traffic stop of Defendant's BMW on November 30, 2014, and the subsequent recovery of six kilograms of cocaine from the trunk. (*Id.*) The affidavits did not identify Williams by name, instead describing him as "one of the people involved in dropping the packages off at the post office" who had spoken to the police on November 30, December 1, and December 2, 2014. (*See, e.g.*, Gov't Ex. 2 at 2–3.) They did, however, include Sergeant Biederman's averment that, based on his training, experience, and

conversations with other officers, drug traffickers often keep relevant records, documents, and cash proceeds in their homes, offices, and other premises that "they own or control." (*Id.* at 3; Gov't Ex. 3 at 3; Gov't Ex. 4 at 3; Gov't Ex. 5 at 3.) The state judge who issued the warrants found probable cause to believe that the listed items were either contraband or would contain evidence of a crime, and that they would be found in the premises under Defendant's control.[2] (*See, e.g.*, Gov't Ex. 2 at 5.)

Police officers executed the four premises warrants between 4:00 p.m. and 7:00 p.m. on December 2, 2014, beginning with the Marriott Hotel room. (*See* Gov't Ex. 2–5 at 6.) Defendant was in the hotel room at the time and placed under arrest. (Gov't Ex. 6 at 2.) A search of his person incident to that arrest uncovered cash, an identification card, and some credit cards. (Gov't Ex. 5 at 6.) Officers also seized five cell phones that were found on the bed in the hotel room, various documents, and a small amount of suspected marijuana. (*See* Gov't Ex. 5 at 6; Gov't Ex. 6 at 2.) During the execution of the search warrants for Defendant's Dupont Avenue home and Washington Avenue loft, officers seized various documents, pieces of mail, a bank deposit bag, and a priority mail box. (Gov't Ex. 2 at 6; Gov't Ex. 4 at 6.) And from the West Broadway Avenue building

---

[2]     The search warrants for the four premises were issued as no-knock warrants based on statements from the CI that Defendant had access to firearms and was capable of killing someone, the seriousness of the drug-trafficking crime that Defendant was suspected of committing, and Williams's statement that Defendant was "hysterical" about the interdiction of his BMW, all of which led Sergeant Biederman to believe that unannounced entries were necessary to prevent Defendant from "doing something drastic and violent to avoid apprehension." (*See, e.g.*, Gov't Ex. 2 at 4–5.)

owned by Defendant and occupied by Green, officers seized documents, two cell phones, and prescription bottles in Green's name. (Gov't Ex. 3 at 6; Gov't Ex. 6 at 2.)

Nearly three weeks later, on December 23, 2014, Officer Evans secured a warrant to search the numerous cell phones recovered by the police during their investigation, including the cell phone seized incident to Green's arrest and the five cell phones found on the bed at the Marriott Hotel. (Gov't Ex. 6.) Evans's supporting affidavit detailed the narcotics investigation into Defendant, Green, and Williams, including the information supplied by the CI, the packages of cocaine intercepted by postal inspectors, Williams's statements that Defendant and Green were involved in the packaging and shipment of the cocaine, and the six kilograms of cocaine recovered from Defendant's BMW. (*Id.* at 2.) The affidavit also attested to the CI's reliability, noting that the informant had provided accurate information in the past which had led to "evidence, arrests and convictions." (*Id.*) Based on her fourteen years of experience as a police officer and conversations with other law enforcement officials, Evans averred that the cell phones might contain data relevant to the drug-trafficking investigation, including data showing that Defendant, Green, Williams, and Rowe had "been in communication with each other during relevant times in the drug conspiracy or otherwise know each other." (*Id.*) The state judge who issued the warrant found probable cause to believe that the cell phones were either used in the commission of a crime or would contain evidence tending to show that a crime had been committed. (*Id.* at 4.) While it is clear that the cell phones were searched pursuant to the December 23, 2014 warrant, there is nothing in the record about the results of those searches. (*See id.* at 6.)

## II.    Motion to Suppress

In his post-hearing memorandum, Defendant seeks to suppress the narcotics, cell-phone data, and documentary evidence uncovered during the police investigation on three principal grounds.[3] First, Defendant contends that the cocaine recovered from his BMW was the fruit of an unlawful roadside stop, search, and seizure of the vehicle without a warrant or probable cause. (Doc. No. 34 at 25–27.) Second, he challenges the facial validity of the warrants to search the various premises under his control. (*Id.* at 2–15.) Third, he contends that the cell phones seized from his hotel room exceeded the scope of the relevant search warrant and were the fruit of his unlawful, warrantless arrest. (*Id.* at 2–4, 27–28.) Oliver also argues that there was misleading information in, and material

---

[3]    Defendant invokes Minnesota law and cites the Supreme Court's decision in *Elkins v. United States*, 364 U.S. 206 (1960), for the proposition that evidence seized in violation of state law is not admissible in federal court. (*See* Doc. No. 34 at 22–23.) As this Court previously explained to Oliver, "federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as [the officers' actions] complied with the Fourth Amendment." (Case No. 15-cr-164, Doc. No. 96 at 15–16 n.2 (quoting *United States v. Bach*, 310 F.3d 1063, 1066 (8th Cir. 2002)); *see also United States v. Maholy*, 1 F.3d 718, 721 (8th Cir. 1993) ("When evidence obtained by state law enforcement officers is offered in a federal prosecution, the legality of the search and seizure is not determined by reference to a state statute [or state procedural rule], but rather is resolved by fourth amendment analysis."). Rather than contradicting this principle, *Elkins* supports it. *See* 364 U.S. at 223–24 ("[W]e hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures *under the Fourth Amendment* is inadmissible . . . . The test is one of *federal law*, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.") (emphasis added).

omissions from, the search warrant affidavits, thus implying that he is entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (Doc. No. 34 at 15–20.)[4]

### A.    The Stop, Search, and Seizure of the BMW

Defendant moves to suppress the six kilograms of cocaine seized from his BMW, claiming that it was the fruit of an unconstitutional roadside stop, search, and seizure of the vehicle without a warrant or probable cause. (Doc. No. 34 at 25–27.) The Government responds that there was probable cause to justify the stop, search, and seizure of the BMW based on the information supplied by the CI, who had a track record of providing accurate information to the police and whose information in this case was thoroughly corroborated. (Doc. No. 35 at 4–7.)

"A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause." *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When "probable cause exists to believe that contraband or evidence of criminal activity is located inside [a] vehicle," a "police officer who has lawfully made a roadside stop of [that] vehicle may search the passenger compartment and trunk" under what is known as the "automobile exception" to the

---

[4]    Defendant also moved to suppress cell phone records obtained without a warrant from the cell phone provider. (Doc. No. 18; Doc. No. 34 at 28–29.) On December 20, 2016, this Court held a telephone hearing on this issue, and Defendant withdrew this aspect of his motion to suppress. (Doc. No. 40.)

Fourth Amendment's warrant requirement. *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016).

When "probable cause depends on information supplied by an informant, the core question is whether the information is reliable." *United States v. Dukes*, 758 F.3d 932, 937 (8th Cir. 2014) (quotation and alterations omitted). Such information may be sufficiently reliable to establish probable cause where the informant has a "track record of providing accurate information," where the information is "at least partly corroborated" by the police, or where the informant has accurately predicted certain events. *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). A tip from a known informant, such as the one at issue here, is generally considered more reliable than an anonymous tip because a known informant's "reputation can be assessed . . . and can be held responsible if [the] allegations turn out to be fabricated." *Florida v. J.L.*, 529 U.S. 266, 270 (2000).

The stop, search, and seizure of Defendant's BMW was supported by probable cause. The CRI's information about the mail shipment from Arizona to Minnesota proved accurate in all material respects, right down to the details about silverware packaging. Then, the CRI's tip about the BMW car shipment was corroborated when the BMW registered to Defendant arrived in Minnesota on the predicted date. Moreover, the informant in this case was previously known to be a reliable informant with a track record of providing accurate information. As stated in Sergeant Biederman's search warrant affidavit, this informant "has provided information that has produced evidence and arrests. This CRI's information has resulted in convictions for felony crimes. I have

found this CRI's information to be accurate, timely, and verifiable." (Gov't Ex. 1 at 2.) Thus, the CRI's tip reliably established a fair probability that drugs would be found in the trunk of Defendant's BMW.

It should be noted, of course, that no drugs were seized from Defendant's BMW until after the police obtained a warrant to search the impounded car on December 2, 2014. Probable cause supports the issuance of the BMW search warrant for the reasons already stated. Under the automobile exception, a warrantless search of the BMW would have been justified in any event.

###    B.    The Facial Validity of the Premises Warrants[5]

Defendant next challenges the facial validity of the warrants to search his residence, hotel room, and properties for narcotics, cash proceeds, documents, and other items indicative of a drug conspiracy. (Doc. No. 34 at 2–15.) He contends that the affidavits in support of those warrants did not provide probable cause to believe that contraband or evidence of a crime would be found in those locations. (*Id.* at 11.) More specifically, Defendant maintains that the affidavits did not provide any indication as to the CI's basis of knowledge to establish probable cause. (*Id.* at 12–14.)[6]

---

[5]    Defendant does not challenge the facial validity of the cell phone warrant. (Gov't Ex. 6.) Instead, as discussed below, he argues that the cell phones from the hotel room were improperly seized because they were beyond the scope of the search warrant. (Doc. No. 34 at 2–4, 27–29; Gov't Ex. 5.)

[6]    Defendant further argues that the premises warrants should not have been issued as no-knock warrants because the supporting affidavits did not provide reasonable suspicion to believe that knocking and announcing the officers' presence would threaten officer safety or the preservation of evidence. (Doc. No. 34 at 20–22.) There is no need to

(Footnote Continued on Next Page)

The role of a court reviewing the issuance of a search warrant is to "ensure that the evidence as a whole provides a substantial basis for finding probable cause to support the issuance of the search warrant." *United States v. Terry*, 305 F.3d 818, 822 (8th Cir. 2002). "[T]he preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination" as to whether an affidavit establishes probable cause. *United States v. Leon*, 468 U.S. 897, 914 (1984). "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)).

---

(Footnote Continued from Previous Page)

address that argument because, as the Supreme Court has held, a violation of the Fourth Amendment's general knock-and-announce rule does not warrant the suppression of evidence. *See Hudson v. Michigan*, 547 U.S. 586, 599 (2006) (holding that "[r]esort to the massive remedy of suppressing evidence of guilt is unjustified" for knock-and-announce violations). In any event, Defendant's argument lacks merit. Given the overall reliability of the CI, the CI's statements that Defendant had access to firearms and was capable of killing someone, Williams's statement that Defendant was "hysterical" about the interdiction of his BMW, and the seriousness of the drug-trafficking offense that the police were investigating, there was reasonable suspicion to believe that abiding by the general knock-and-announce rule would pose threats to officer safety or of the destruction of evidence. *See United States v. Scroggins*, 361 F.3d 1075, 1081 (8th Cir. 2004). Contrary to Defendant's arguments, the fact that the warrant affidavits did not indicate how the CI knew that he had access to firearms or otherwise claim that he "possessed any firearms," "committed any violent acts with a firearm in the past," or "carried a weapon on his person" do not obviate a finding of reasonable suspicion. (*See* Doc. No. 34 at 22.) Reasonable suspicion is not a high standard; it simply requires a "particularized and objective basis" under the "totality of the circumstances" to believe that knocking and announcing would be "dangerous" or "would inhibit the effective investigation of the crime." *Scroggins*, 361 F.3d at 1081. That standard was met.

The supporting affidavits "should be examined under a common sense approach and not in a hypertechnical fashion." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

The affidavits in support of the four premises warrants provided a substantial basis for concluding that Defendant was involved in drug trafficking and that narcotics or other evidence of drug trafficking would be found on those premises. (*See* Gov't Ex. 2–5.) The affidavits, sworn by Sergeant Biederman, described the information provided by the CRI, the CRI's track record of reliability, and the investigative efforts to corroborate the CRI's information, including the packages of cocaine intercepted by postal inspectors and in Defendant's BMW. (Gov't Ex. 5 at 2.) The affidavits stated further that "one of the people involved in dropping the packages off at the post office," *i.e.* Williams, "confirmed the CRI's information concerning the [intercepted] packages"; that Defendant knew about the six kilograms of cocaine being transported in his car; and that Defendant owned or occupied the various premises identified in the search warrants. (Gov't Ex. 5 at 2–3.) Biederman also averred, based on his "training, experience, and upon conversations with other law enforcement officers," that "large scale drug traffickers often keep the proceeds of their narcotics sales in cash" at "an address that they own or control," in addition to "records and documents concerning their travels, vehicles, associates, and real estate . . ." (Gov't Ex. 5 at 3.) Thus, there was probable cause for the issuing judge to believe that the items listed in the search warrants—including narcotics, documents, mailings, address books, and cell phones—would contain evidence of a drug conspiracy.

The affidavits' failure to specifically identify the CI's basis of knowledge does not undermine the existence of probable cause. An informant's reliability, veracity, and basis

of knowledge "are not entirely separate and independent requirements to be rigidly exacted in every case." *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (quoting *Gates*, 462 U.S. at 230). The "core question" in assessing probable cause based on information supplied by an informant is simply "whether the information is reliable." *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014). For the reasons already explained, the CI's information was reliable. Furthermore, an informant's basis of knowledge need not be expressly outlined in a warrant affidavit, as such a basis may be inferred from the level of detail provided by the informant. *See Spinelli v. United States*, 393 U.S. 410, 416–17 (1969) (explaining that where an informant's tip describes a suspect's activities "in sufficient detail," an issuing judge may "reasonably infer that the informant gained his information in a reliable way"), *abrogated on other grounds by Gates*, 462 U.S. 213. The wealth of details provided by the CI, including the precise post office where one of the intercepted packages was mailed from, the use of silverware boxes to conceal the mailed cocaine, and the fact that Oliver's gray BMW would be arriving in Minneapolis with cocaine in tow on the night of November 30, 2014, was sufficient to establish a basis of knowledge. (*See* Gov't Ex. 5 at 2.)

Finally, even if any of the premises search warrants could be considered invalid, the evidence that was seized would still be admissible under the good faith exception established in *United States v. Leon*, 468 U.S. 897 (1984). An invalid warrant requires suppression only if (1) the issuing judge was misled by the affiant's known or reckless false statement; (2) the issuing judge wholly abandoned his judicial role; (3) the supporting affidavit was "so lacking in indicia of probable cause as to render official

15

belief in its existence entirely unreasonable"; or (4) the warrant was "so facially deficient" that the executing officer could not reasonably presume its validity. *United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir. 2009) (quoting *Leon*, 468 U.S. at 923). None of these requirements are met in the instant case. As noted above, the warrants are not facially deficient or lacking in indicia of probable cause. And as discussed below, the affidavits did not include any false or misleading statements.

## C.      Entitlement to a *Franks* Hearing

Defendant does not explicitly ask for a *Franks* hearing, but he argues that the issuing state judge was misled by certain information and material omissions in Sergeant Biederman's search warrant affidavits. (Doc. No. 34 at 15–20; Gov't Ex. 1–5.)[7] By making this argument, Defendant seems to imply that he is entitled to a *Franks* hearing.

"Under *Franks* [*v. Delaware*] and its progeny, a defendant may challenge a search warrant on the grounds that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008). To be entitled to a *Franks* hearing, Defendant must make a "substantial preliminary showing of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the probable cause determination." *United States v. Crissler*, 539 F.3d 831, 833–34 (8th Cir. 2008). This

---

[7]      The supporting affidavit for the cell phone warrant was provided by Officer Evans, not Sergeant Biederman. Therefore, Defendant's implied request for a *Franks* hearing does not apply to the cell phone warrant. (Doc. No. 34 at 15–20; Gov't Ex. 6.)

standard "is not lightly met." *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 2008).

Because there is "a presumption of validity with respect to the affidavit supporting the

search warrant, . . . the challenger's attack must be more than conclusory and must be

supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.

Defendant argues that he is entitled to a *Franks* hearing because Sergeant

Biederman's affidavits did not inform the issuing judge that Desmond Williams was

involved in mailing a package of cocaine to Minnesota. According to Defendant, the

"clear intent of such an omission is to give the judge the impression that the person being

referenced [in the affidavit] had no criminal involvement." (Doc. No. 34 at 15–16.) The

affidavits do not give that impression, however, as they all clearly state that on November

30, 2014, Sergeant Biederman and Officer Evans "interviewed one of the people *involved*

*in dropping the package off at the post office*. This person confirmed the CRI's

information concerning the packages being dropped off at the post office, the way they

were packaged, and those involved." (Gov't Ex. 2–5 at 2 (emphasis added).) Thus, while

the affidavits did not identify Williams by name, they clearly disclosed to the issuing

judge that the person being referenced was a criminal participant.

Defendant further argues that the affidavits are misleading under the theory that

Williams and the CRI are actually the same person. (Doc. No. 34 at 16–18.) Once again,

Defendant offers nothing to undermine the conclusion that the CRI is a mere tipster

whose identity is privileged. (Doc. No. 36, December 12, 2016 Order at 3.) The search

warrants clearly distinguish between the CRI and the cooperating witness, Williams, who

was "one of the people involved in dropping the packages off at the post office," and also

"confirmed the CRI's information, the way [the drugs] were packaged, and those involved." (Gov't Ex. 2 at 2.)

Finally, with respect to the BMW search warrant, Defendant argues that the issuing judge was misled because Sergeant Biederman's affidavit does not mention that the BMW had been stopped, searched, and seized on November 30, 2014, and that drugs had been found in the vehicle. (Doc. No. 34 at 18–19.) To the contrary, the affidavit does state that the BMW had been stopped and seized. (*See* Gov't Ex. 1 at 2.) Moreover, as noted above, drugs were not found in the BMW until after the search warrant was obtained.

### D.   The Seizure of Cell Phones from Oliver's Hotel Room

Defendant argues that the seizure of cell phones from his hotel room was beyond the scope of the search warrant. The warrant for the hotel room authorized the seizure of narcotics, proceeds from the sale of narcotics, and "[d]ocuments, mails, keys, address books, notes, receipts, ledgers, photographs, and *other media*" indicative of criminal activity. (Gov't Ex. 5 at 5 (emphasis added).)[8] Cell phones, of course, could constitute "other media" under the hotel room warrant. Moreover, the cell phone itself could have contained other items listed in the search warrant. *See United States v. Gamboa*, 439 F.3d 796, 807 (8th Cir. 2006) (stating that "cell phones may well contain 'records of the use and purchase of controlled substances'" as stated in the search warrant).

---

[8]     The other warrants, by contrast, explicitly list cell phones as items to be seized. (Gov't Ex. 1–4.)

The seizure of the cell phones in the hotel room was also justified under the plain-view doctrine. Under this doctrine, police may seize, without a warrant, an item that is (1) in plain view, (2) when it is observed from a lawful vantage point, (3) where the incriminating character of the item is immediately apparent. *Horton v. California*, 496 U.S. 128, 136–37 (1990). The cell phones in the hotel room were recovered in plain view from the hotel room bed. (Gov't Ex. 5 at 6.) The incriminating character of cell phones was immediately apparent since cell phones are recognized tools of the drug trade. *United States v. Lazcano-Villalobos*, 175 F.3d 838, 844 (10th Cir. 1999); *United States v. De La Cruz*, 996 F.2d 1307, 1311 (1st Cir. 1993).

## III.   Motion to Dismiss the Indictment

In moving to dismiss the previous indictment, the Government cited Federal Rule of Criminal Procedure 48(a), which provides that the "government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent." (Case No. 15-cr-164, Doc. No. 188.) The motion requested dismissal without prejudice and it was granted as such: "IT IS HEREBY ORDERED that pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, the motion of the United States for dismissal is hereby GRANTED and the Indictment against the above-named defendant is dismissed without prejudice." (Case No. 15-cr-164, Doc. No. 189.)

Defendant argues that the dismissal was improper because Rule 48(a) does not allow for dismissal "without prejudice." However, as a "general rule, a dismissal with leave of court [pursuant to Rule 48(a)] is considered to be without prejudice." *Demarrias*

*v. United States*, 487 F.2d 19, 21 (8th Cir. 1973). Moreover, Rule 48(a) "has been regularly interpreted to mean that a dismissal of an indictment at the request of the government prior to trial does not bar subsequent prosecution for criminal acts described in that indictment." *Id.*; *see also United States v. Raineri*, 42 F.3d 36, 43 (1st Cir. 1994) ("Customarily Rule 48(a) dismissals are without prejudice and permit the government to reindict within the statute of limitations."); *United States v. Matta*, 937 F.2d 567, 568 (11th Cir. 1991) ("Generally unless a contrary intent is clearly expressed, Rule 48(a) dismissals are without prejudice.").

Finally, Defendant now argues, for the first time, that the Indictment must be dismissed under the Speedy Trial Act. 18 U.S.C. § 3161. Defendant asserts that his right to a speedy trial has been violated by the filing, dismissal, and then re-filing of an Indictment based on the same facts. (Doc. No. 34 at 34.) However, the Act provides:

> If any indictment or information is dismissed upon motion of the defendant, or any charge contained in a complaint filed against an individual is *dismissed or otherwise dropped*, and thereafter a complaint is filed against such defendant or individual charging him with the same offense or an offense based on the same conduct or arising from the same criminal episode, or an information or indictment is filed charging such defendant with the same offense or an offense based on the same conduct or arising from the same criminal episode, the provisions of subsections (b) and (c) of this section shall be applicable with respect to the *subsequent* complaint, indictment, or information, as the case may be.

18 U.S.C. § 3161(d)(1) (emphasis added). Thus, Defendant's speedy trial clock started anew when he was re-indicted. § 3161(c) (providing that in "any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date

(and making public) of the information or indictment, or from the date the defendant has

appeared before a judicial officer of the court in which such charge is pending, whichever

date last occurs"). None of the time that elapsed previously counts against the current

speedy trial clock.[9]

### RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1. Defendants' Motion to Suppress (Doc. No. 18) be **DENIED**; and

2. Defendant's Motion to Dismiss the Indictment (Doc. No. 17) be **DENIED**.


Date:  December 28, 2016

_s/ Becky R. Thorson_
BECKY R. THORSON
United States Magistrate Judge

---

[9]     Defendant also argues that the clock started when he was indicted in state court on
December 2, 2014. (Doc. No. 34 at 33.) Once again, this argument misses the mark. None
of the time that elapsed prior to the filing of the current Indictment matters for purposes
of the Speedy Trial Act.

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report by **January 4, 2017**. A party may respond to those objections within **seven days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).


**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.


Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.